# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00733-CR

**Bowan Williams, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
### NO. D-1-DC-07-904047, HONORABLE MICHAEL LYNCH, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted Bowan Williams of two counts of aggravated assault and one count of deadly conduct with a deadly weapon. *See* Tex. Penal Code Ann. § 22.02(a)(1), (2) (West Supp. 2008); § 22.05(b) (West 2003). The district court assessed punishment at 26 and 20 years' imprisonment for the two counts of aggravated assault and ten years' imprisonment for the offense of deadly conduct with a deadly weapon. In a single issue on appeal, Williams challenges the factual sufficiency of the evidence establishing his identity as the assailant. We will affirm the judgment.

## BACKGROUND

The jury heard evidence that, on the morning of October 5, 2006, at approximately 4:15 a.m., the victim, Daniyell Wright, was shot and assaulted by a man dressed in black. Wright testified that the assault occurred when she and her boyfriend, Mitchell Thompson, were leaving Wright's apartment to go to work. According to Wright, as she and Thompson were headed toward

the parking lot, she looked over her shoulder and saw somebody "standing in black with a gun." Wright "took off running," until her leg gave out on her and she fell to the ground. Although she did not immediately realize it, Wright had been shot in the leg. After Wright fell to the ground, she testified, the assailant approached her and started hitting her in the head. Wright did not know if the assailant was hitting her with his gun or his fists, but she recalled covering her head with her hands in an attempt to defend herself. At some point, according to Wright, the assailant dropped the gun, she picked it up, and the assailant "started running." As the assailant ran away, Thompson ran over to Wright and helped her up. They returned to Wright's apartment, where they called the police.

Wright told Thompson, the police, and paramedics that the assailant was her ex-boyfriend, whom she identified as "Byron Williams."[1] Wright also identified Williams in court as the man who attacked her. During her trial testimony, when the State asked Wright how she knew it was Williams who had shot her, Wright testified that she "just knew it was him" because she had been dating Williams for four years, had "seen him before in the black [clothing]," and "knew his posture, [] knew the way he stood and everything." Wright described the man who assaulted her as wearing black pants, a black hoodie, and a black scarf "that had white in it." Wright explained that, on an occasion in 2004, two years prior to the assault, Williams had come to her house "dressed up in black," wearing black pants and a black hoodie that "were the same or looked the same" as those worn by the assailant.

---

[1]    Wright testified that she never called Williams "Bowan." Later during trial, Jeffrey Rosenboro, a friend of Williams, confirmed that, although Williams's first name was "Bowan," he goes by the name "Byron."

2

When asked to describe what part of her assailant she was able to see during the assault, Wright testified, "I just seen the black. I didn't see the eyes or anything like that because it was dark and the hood was covering [his face]." When asked if there was anything else about her assailant that she recognized, Wright testified that, when the assailant ran off, she "knew his run." Wright explained, "When [Williams] stands he is kind of bowlegged, and when he runs, it is kind of to the side a little bit." Wright also testified that she recognized Williams's "height, his weight, his posture." When asked what was unique about Williams's posture that made it identifiable to her, Wright testified, "Just his build, I know his build. I was with him for four years."

The State elicited further testimony from Wright about the nature of her four-year relationship with Williams. Wright testified that, during the time she and Williams had been dating, they were physically and sexually intimate. Wright also testified that, during their relationship, she and Williams "always argued." When asked what they frequently argued about, Wright testified, "Mostly was the jealousy. He didn't want me talking to other dudes, or he would always ask me what dude talked to me today or who I talked to today." Wright testified that she ended her relationship with Williams at the end of June or July 2006.

Wright further testified that, after the relationship ended, she and Williams continued talking on the phone. Wright described one particular phone conversation that occurred approximately one week before the assault:

Q:    What were you all talking about in that phone call?

A:    He was telling me that he missed me, how he wanted to get back with me and that he couldn't live without me.

3

Q:     Was that the first time since you broke up that he said he wanted to get back together with you?

A:     No, that wasn't the first time.

Q:     How often did that happen?

A:     Just about every day.

Q:     Okay. And you would tell him no every time?

A:     Right, and that I wasn't happy, that I couldn't be with somebody that treated me like that.

Q:     This particular phone call that week before, do you remember what else he was saying?

A:     Well, as soon as I said that I couldn't get back with him or I wasn't happy, it was like his whole attitude changed, and then he started talking about how he had thoughts of killing me and that if he couldn't have me that nobody else could, and then he was telling me about his grandma, how she was somebody that was very important to him and she raised him since he was little and that I was important to him, and since she passed away and that I didn't want to be with him no more, he told me that nobody—he was going to mess me up so bad that nobody else would want me.

After the State briefly interrupted Wright's testimony to ask her if she was "all right," Wright continued, "He told me . . . that he didn't care if he went to jail or not, and if anything was to happen to me, that he said that he was going to act like he didn't know what happened."

After the assault, Wright sought and obtained a protective order against Williams. A transcript of Wright's prior testimony from the protective-order hearing was admitted into evidence. Wright's testimony at the hearing was largely consistent with her testimony at the criminal trial. At trial, the State asked Wright to repeat her answers from various questions that were asked during the hearing. One particular line of questioning to which the State directed the jury's attention was the following:

4

Q:      And how certain are you that [the assailant] was Mr. Williams?

A:      Very certain.

Q:      100 percent certain?

A:      Yes.

Mitchell Thompson also testified about his recollection of the assault. Thompson recalled that, as he and Wright were headed toward his car, he heard a male voice say "what the f***." Thompson turned to his right and saw a spark from a gunshot directed toward himself and Wright. At this point, Thompson recounted, he and Wright started running, and they soon separated. According to Thompson, the gunman stayed with him, and Thompson turned around and ran in another direction to try and dodge the bullets. Thompson could hear the gun firing as he ran, and he estimated that he heard at least five or six shots. Thompson testified that there was lighting in the area that enabled him to see the person who was holding the gun. When asked to describe this person, Wright testified, "He had on all black. Black jeans, a hoodie, and a scarf over his face." Thompson could also tell that the shooter was a man. Although Thompson could not determine the assailant's race, from the small portion of the man's face that was uncovered, Thompson "knew he wasn't white."[2]

Thompson also testified that, at some point while he was running, he heard Wright screaming and ran over to her. Thompson saw the assailant on top of Wright. Once the assailant saw Thompson coming, according to Thompson, the assailant ran away. Thompson testified that he started to chase after the assailant, but then decided to attend to Wright. As the assailant ran

---

[2] The record reflects that Williams is a black male.

5

away, Thompson observed that the man "had a limp, like something was wrong with his leg or something." Thompson testified that he perceived the assailant as "actually bigger than me and a little shorter." Thompson clarified that, by "bigger," he meant "stockier." Thompson testified that he (Thompson) was around six feet and four inches tall and weighed 225 pounds. Earlier in the trial, Wright had described Williams as being six feet tall and weighing about 230 pounds.

When Wright and Thompson returned to the apartment after the assault, they had in their possession the gun the assailant had dropped. Wright testified that she recognized the gun. According to Wright, on the day in 2004 that Williams had come over to her house dressed in black, she had seen him holding a gun that was "the same shape and the same color" as the gun used by the assailant. The police, after taking custody of the gun, determined that the gun was not registered to Williams, and they were unable to trace the gun's ownership.

The police tested the gun for latent prints. A latent print, according to the State's fingerprint expert, Officer Joseph Flores of the Travis County Sheriff's Office, "is the pattern left by friction ridges when you touch an object." Officer Flores testified that he recovered a latent palm print off of the side of the magazine of the gun. Flores was able to get "three lifts" off of the print that were of "very good quality."[3] When Flores compared the print recovered from the gun against Williams's palm print, Flores found fifteen "points of reference" matching Williams's print. According to Flores, the standard operating procedure for the Travis County Sheriff's Office is "a minimum of eight points of reference for a positive ID." Flores testified that he saw additional

---

[3] Officer Flores testified that prints are lifted multiple times in an effort to "get more detail" from the prints. Because the first lift often includes dust or dirt particles, Flores explained, subsequent lifts can provide "a better print."

points of reference on the print, but he stopped at fifteen points because "he was running out of room to draw [the points of reference]."

The police further analyzed the gun for the presence of DNA. Jody Koehler, the State's DNA expert, testified that the DNA profile obtained from the gun was consistent with Wright's DNA profile. However, the DNA profile was not consistent with the DNA profiles of either Williams or Thompson. According to Koehler, this meant that the DNA of Williams and Thompson "was not detected in that DNA profile," and they were "excluded as contributors." Koehler went on to explain, however, that "sometimes the DNA may be present but it is below a detectible level, . . . It doesn't mean it is not there. It just means it is lower than a detectible level." Koehler also testified that the process used to lift latent prints from an item makes it difficult to subsequently detect DNA on that item.

The morning following the assault, the police attempted to contact Williams. Detective Michael Straun of the Travis County Sheriff's Office called Williams and left a message, asking Williams to call him back. Williams did not return the call until later in the afternoon. Detective Straun was off duty when Williams called back, so Williams spoke instead with Detective Chris Rowland, the lead detective in the investigation. Detective Rowland testified that, initially, all he told Williams was that an ex-girlfriend of Williams's had been shot and that the police were investigating the shooting. Rowland also told Williams that it was "normal protocol in this situation to reach out to any ex-boyfriends, ex-friends with a grudge or anything like that and begin to ask them to come in and talk to me about the incident that occurred." Rowland testified that, when he eventually revealed to Williams that the woman who had been shot was Wright, Williams claimed

7

that he and Wright had not dated "in a long time." Rowland testified that Williams did not express any concern for Wright during the conversation. Rowland also testified that, when he asked Williams to come in for questioning, Williams told him that he was in Dallas that weekend for the Texas-Oklahoma game (the phone conversation between Williams and Rowland occurred on a Friday), but that he would be willing to come in to the station later, perhaps on Sunday. However, according to Rowland, Williams never came in to the station.

The only witness to testify for the defense was Williams's friend, Jeffrey Rosenboro. Rosenboro, who lived in Dallas at the time of the assault, testified that he found Williams asleep on his couch at approximately 5:15 a.m. on the morning the assault occurred. According to Rosenboro, Williams had come up to Dallas that weekend for the Texas-Oklahoma game. Williams, Rosenboro recounted, was a "very close friend" of his who visited Rosenboro on a regular basis and had a key to his home. Rosenboro testified that Williams was his guest the entire weekend, through Monday morning. On Friday, according to Rosenboro, he and Williams "went car shopping" after Rosenboro got off from work. Rosenboro testified that he and Williams also attended the State Fair that weekend, but they "didn't get to the [Texas-Oklahoma] game because the tickets was [sic] too expensive."

The jury found Williams guilty of two counts of aggravated assault and one count of deadly conduct as charged in the indictment. Williams was sentenced to 26 years' and 20 years' imprisonment for the two aggravated assault counts, and ten years' imprisonment for the deadly conduct offense. This appeal followed.

8

## STANDARD OF REVIEW

Williams challenges only the factual sufficiency of the evidence. In a factual sufficiency review, we view all the evidence in a neutral light and ask whether a trier of fact was rationally justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We "must be cognizant of the fact that a jury has already passed on the facts and must give due deference to the determinations of the jury." *Lancon v. State*, 253 S.W.3d 699, 704-05 (Tex. Crim. App. 2008). A verdict should be set aside only if the evidence supporting the verdict is so weak as to render the verdict clearly wrong or manifestly unjust. *Id*. at 705; *Korell v. State*, 253 S.W.3d 405, 412 (Tex. App.—Austin 2008, pet. ref'd).

## ANALYSIS

In his sole issue on appeal, Williams asserts that the evidence is factually insufficient to prove his identity as the perpetrator of the assault. Identification of the defendant as the person who committed the offense charged is part of the State's burden of proof beyond a reasonable doubt. *Miller v. State*, 667 S.W.2d 773, 775 (Tex. Crim. App. 1984); *Wiggins v. State*, 255 S.W.3d 766, 771 (Tex. App.—Texarkana 2008, no pet. h.). Identity may be proven by direct evidence, circumstantial evidence, or reasonable inferences from such evidence. *Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd). Juries are permitted to make reasonable inferences from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Hooper v. State*, 214 S.W.3d 9, 14-15 (Tex. Crim. App. 2007).

In this case, the evidence supporting the jury's finding that Williams was the perpetrator of the assault included the following:

9

- Wright testified that she "just knew it was [Williams]" who assaulted her because she recognized several of Williams's physical features in the assailant, including his height, his weight, his posture, and the way he ran "kind of to the side a little bit." Wright was familiar with these features because she had been in a physically and sexually intimate dating relationship with Williams for four years prior to the assault.

- Wright testified that the assailant was dressed in black pants and a black hoodie that "were the same or looked the same" as clothing she had seen Williams wear on a prior occasion.

- Wright testified that, while she and Williams were dating, they would "always argue," "mostly about" Williams's jealousy of Wright talking to other men. When Wright was assaulted, she was with her new boyfriend, Thompson.

- Wright testified about a phone conversation she had with Williams after they broke up and approximately one week prior to the assault. In the conversation, according to Wright, Williams spoke of how "he couldn't live without" Wright, how "he had thoughts of killing" Wright, how, if he could not have Wright, "that nobody else could," how he was "going to mess [Wright] up so bad that nobody else would want [her]," and how "he didn't care if he went to jail or not, and if anything was to happen to Wright," that "he was going to act like he didn't know what happened."

- Thompson's description of the assailant was consistent with Wright's. Thompson testified that the assailant "had on all black. Black jeans, a hoodie, and a scarf over his face." Thompson also testified that the assailant was a man with a limp, "like something was wrong with his leg or something." Thompson further explained that he perceived the assailant as "actually bigger than me and a little shorter." Thompson testified that he was around six feet and four inches tall and weighed 225 pounds. Earlier in the trial, Wright had described Williams as being six feet tall and weighing about 230 pounds.

- Detective Rowland testified that, when he told Williams that Wright had been shot, Williams expressed no concern for her. Williams told Rowland that he had not dated Wright "in a long time," even though, according to Wright, the relationship had ended only a few months prior to the assault.

- Wright testified that the gun that was used in the assault was "the same shape and the same color" as a gun she had seen Williams possess on a prior occasion.

- A palm print "of very good quality" was found on the gun that was used in the assault. According to the testimony of Officer Joseph Flores, all that is needed for a positive identification of a print are eight points of reference. The print lifted from the gun matched Williams's palm print using fifteen points of reference.

10

- In prior testimony at the protective-order hearing, and again during the criminal trial, Wright testified that she was "very certain" that the assailant was Williams. In fact, when Wright was asked if she was "100 percent certain" that the assailant was Williams, she testified, "Yes."

The evidence contrary to the jury's finding that Williams was the perpetrator of the assault consisted of the following:

- During the assault, Wright was unable to identify any facial features of the assailant because of how dark it was and because of the scarf covering most of the assailant's face.

- For the same reasons, Thompson was unable to identify the assailant's race, other than that "he wasn't white."

- Williams was "excluded as a contributor" of the DNA found on the gun. Additionally, the gun was not registered to Williams and the police were unable to trace the ownership of the gun.

- Rosenboro testified that Williams was at Rosenboro's home in Dallas near the time the assault occurred.

Viewing the above evidence in a neutral light, we find that the jury was rationally justified in finding, beyond a reasonable doubt, that Williams perpetrated the assault. Although it was dark outside and most of the assailant's face was covered, the jury could have reasonably concluded that Wright observed enough of the assailant's physical features to be able to positively identify the assailant as Williams, especially in light of Wright's testimony that she had been physically and sexually intimate with Williams in a dating relationship for four years prior to the assault. Furthermore, the jury could have reasonably concluded that Thompson's and Wright's consistent descriptions of the assailant added credibility to Wright's identification. Also, the jury could have reasonably inferred that the threatening nature of Williams's alleged remarks to Wright

11

in a phone conversation the week prior to the assault was evidence that Williams intended to assault Wright. With regard to the gun used in the assault, there was evidence both in support of and contrary to the State's theory that it belonged to Williams. We find nothing irrational about the jury crediting the evidence supporting the State's theory (the palm print lifted from the gun that matched Williams's palm print, Wright's testimony about having seen Williams with a similar gun) and discounting the evidence supporting the defense theory (the DNA evidence tending to exclude Williams as a contributor, the fact that the gun was not registered to Williams). As for Rosenboro's alibi testimony that Williams was in Dallas when the assault occurred, the jury, as the sole judge of the credibility of the witnesses, was entitled to disbelieve the testimony of someone who considered himself "a very close friend" of Williams. The evidence supporting the jury's finding that Williams perpetrated the assault is not "so weak as to render the verdict clearly wrong or manifestly unjust." *See Lancon*, 253 S.W.3d at 705. We overrule Williams's sole issue on appeal.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Puryear and Pemberton

Affirmed

Filed: November 26, 2008

Do Not Publish

12